41896. ADAMS v. THE STATE.
(330 SE2d 869)

BELL, Justice.

Thomas Camillus Adams was indicted for the malice murder of Barbara Caldwell, a/k/a Barbara Hartline. He was found to be guilty but mentally ill, OCGA § 17-7-131, and was sentenced to life imprisonment.[1] Adams appeals, and we affirm.

Adams and his wife lived in a mobile home in Lyerly, Georgia, across the street from Barbara Caldwell and Howard Gene Hartline.[2] Gene and Adams had been friendly, but Barbara did not like Adams, and pressured Gene into avoiding him. On the evening of June 29, 1984, Adams visited the Hartlines. Gene asked him to leave, and Adams responded by threatening to turn loose his vicious dog and telling Gene that he was going to kill something. Adams returned to his

---

[1] The homicide occurred on June 29, 1984. Adams was indicted on August 8, 1984, by the grand jury of Chattooga County. On August 31, 1984, a trial jury returned a verdict of guilty but mentally ill, and the trial court sentenced Adams to life imprisonment. He moved for a new trial on October 1, 1984, which was denied November 26. Notice of appeal was filed December 11. On October 22, 1984, the court reporter certified the transcript, and it was filed with the clerk of the superior court November 20. The appeal was docketed in this court on January 7, 1985. On February 22, 1985, the appeal was submitted for decision without oral arguments.

[2] Barbara Caldwell and Gene Hartline had been legally married a short period of time. Apparently they had divorced, but were living together on June 29, 1984.

home, and the Hartlines went to bed. Later that night they awoke to find their house ablaze. Gene went outside and extinguished the fire. He smelled a strong odor of kerosene, and accused Adams, who was present, of starting the blaze. A melee ensued, during the course of which Mrs. Adams shot and wounded Gene Hartline with a .22 rifle, and the appellant killed Barbara Hartline with a single blast from a 20-gauge shotgun. There were no eyewitnesses to the slaying, but one observer, Jerry Donald Rutledge, testified that he heard a blast after he saw Adams go around the back of the Hartline house, then saw Adams return to the front of the house and yell at a police officer, "You better call the ambulance, I killed the old S.O.B., or she's dying," or, "You better call an ambulance . . . the old son of a bitch, she's dead or dying." Another witness, the police officer, testified that Adams, after emerging from the back of the house, frantically beat on the officer's car four or five times with the butt end of his shotgun and yelled, "Hey, son of a bitch, call the ambulance 'cause I know I've shot that ole bitch twice." Barbara's body was later discovered in back of the Hartline house. Dr. Warren Tillman, a medical examiner with the State Crime Lab, testified that his autopsy revealed Barbara had died of a single shotgun blast to the back. Kelly Fite, a firearms examiner with the State Crime Lab, estimated that she had been shot from a distance of about 38 feet.

When Adams was arrested he asked an arresting officer, "How many of the sons-of-bitches did I kill?" At trial Adams did not deny having shot the deceased, but testified that he had no recollection of doing so — he claimed that the last events he remembered before he was arrested were that Hartline had accused him of setting the fire and had spun or pulled him, and that at that moment he had been scared of Hartline. He said that he remembered nothing else of the events leading to his arrest.

Adam's defense was insanity at the time of commission of the offense. Psychiatrist Frank G. Pratt testified that he had treated the defendant on multiple occasions for the VA on an outpatient basis during the period 1980-84. According to his records, Adams had been discharged from the army in 1968, with psychiatric hospitalization for six months, and had subsequently been rehospitalized on multiple occasions. In 1978 he had suffered a gunshot wound to the head, and the wound had necessitated the removal of part of his left frontal lobe and the insertion of a metal plate to replace bone which had been removed from his forehead. The residual effects of the wound were a continuing seizure disorder, inability to smell or taste, double vision, and blackouts. Adams was on medication to control his seizures. According to Dr. Pratt, the missing portion of Adams' brain controlled emotion and thinking. Its absence, combined with post-traumatic stress stemming from his Vietnam service, caused him to be unstable

and "quite paranoid." He was prone to misinterpret daily events, became frightened easily, had low impulse control, and experienced rage episodes. In Dr. Pratt's opinion, Adams might black out in a situation where he felt frightened, and during the blackout period he would not be able to distinguish between right and wrong. Dr. Pratt further testified that based on the information he had, including what Adams had told him, he was of the opinion that Adams was unable to distinguish between right and wrong when he killed the deceased. In addition to Dr. Pratt's testimony, two lay witnesses acquainted with Adams testified that they had known him to have serious mental problems. One of them, Adams' former wife, said that in her experience he frequently did not know what he was doing, and at times was insane.

1. In his first enumeration Adams contends that the trial court erroneously denied his motion for new trial. This enumeration raises two related issues.

a. First, appellant raises the general grounds. However, we find that the evidence, viewed in the light most favorable to the state, was sufficient for a rational trier of fact to have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

b. Second, it is appellant's argument that the evidence showed he was insane when he committed the homicide. The evidence upon which he relies consists of the homicide itself, which he characterizes as having been "utterly senseless"; the evidence that he was repeatedly hospitalized for psychiatric treatment; and Dr. Pratt's testimony concerning his mental condition. Adams argues that the effect of this evidence was to establish that he was unable to distinguish right from wrong when he killed the victim, and asserts that therefore the only proper verdict would have been one of not guilty by reason of insanity, OCGA § 16-3-2.[3] We disagree.

"Georgia law presumes the sanity of an accused, but this presumption may be rebutted. OCGA § 16-2-3; *Butler v. State*, 252 Ga. 135 (311 SE2d 473) (1984); *Durham v. State*, 239 Ga. 697 (238 Ga. 334) (1977). Insanity is an affirmative defense which the defendant must prove by a preponderance of the evidence. *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982). '[B]ecause jurors are not bound by the opinions on sanity of either lay or expert witnesses, the jury may reject defense testimony on insanity even if uncontradicted; the presumption of sanity does not disappear upon the introduction of evi-

---

[3] OCGA § 16-3-2 provides that "a person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence."

dence to the contrary and may be relied upon by the jury even after the introduction of evidence of insanity.' Id. at 71." *Murray v. State*, 253 Ga. 90, 91-92 (1) (317 SE2d 193) (1984).

In this case the jury was authorized by all the circumstances, including Adams' motive to kill the deceased (her interference in his friendship with Gene) and his utterances after the murder, to find that Adams was able to distinguish right from wrong when he killed Barbara Caldwell Hartline. We therefore conclude that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Adams failed to prove by a preponderance of the evidence that he was insane at the time of the crime. *Murray*, supra. Accordingly, the superior court did not err by denying the motion for new trial.

2. In his second enumeration appellant contends that the court erred in instructing the jurors that the standard by which appellant's acts were to be judged was that of the conduct of a reasonable person. We find no error. *Moses v. State*, 245 Ga. 180 (2c) (263 SE2d 916) (1980).

3. Likewise, contrary to appellant's third enumeration, we find that the superior court correctly charged the jury that the defendant's inability to evaluate the quality and consequences of his acts to the same degree as a normal or average person would not excuse him if he was able to distinguish between right and wrong. *Moses v. State*, supra, 245 Ga. (2d).

4. In his fourth enumeration appellant argues that the court erred by giving the jury the following charge: "Now I charge you, Ladies and Gentlemen, under our law, every person is presumed to be of sound mind and discretion, but this presumption may be rebutted." We find no error. *Brown v. State*, supra, 250 Ga. (2).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 27, 1985.

*Westbrook & Vines, Carlton H. Vines*, for appellant.

*David L. Lomenick, Jr., District Attorney, David L. Whitman, Assistant District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Senior Attorney*, for appellee.