## 40356. BUTLER v. THE STATE.

GREGORY, Justice.

Appellant, Mary Adams Butler, was indicted in 1980, in Decatur County, for the murder of James West, Sr. Following the incident, appellant was committed to Central State Hospital pursuant to a special plea of insanity. After a hearing in May 1983, the court, sitting without a jury, determined appellant was competent to stand trial. Following a trial by jury, appellant was found guilty of murder and sentenced to life imprisonment. Appellant's motion for a new trial was denied. She appeals.

The undisputed evidence presented at trial shows that on October 28, 1980, the appellant's parents sought an emergency, involuntary commitment of appellant to Southwestern State Hospital for psychiatric treatment and evaluation. Appellant's parents filed the required affidavits in the Probate Court of Decatur County averring that appellant was mentally ill and an imminent danger to herself and others. On that same day, the judge of the Probate Court, being familiar with appellant's previous mental problems, issued an order directing any peace officer to take appellant into custody and deliver her to Southwestern State Hospital for emergency psychiatric treatment and evaluation. Pursuant to this order, the sheriff's department dispatched Deputies James West, Sr. and Ray Brackin to the appellant's home to take her into custody.

Upon arriving at appellant's home, her father advised the deputies that appellant was not aware they were coming to take her to the hospital and that she was in her room. The officers asked the appellant to come out of her room and she replied "I'm coming." When appellant came out, she walked through the kitchen area where the officers were located and proceeded to another part of the house. The deputies separated so they could block all the exits from the house. Deputy Brackin went to cover the living room door and Deputy West followed the appellant to another room. Thereupon, the appellant produced a knife and struck Deputy West in the chest area. Deputy Brackin saw West's "hands fly up" while he stumbled backwards. He saw the appellant chase after Deputy West with the knife in her hand. Deputy Brackin and appellant's family subdued

the appellant, procured the weapon, and called an ambulance. Attempts were made to revive Deputy West but he was declared dead upon arrival at the hospital.

Due to appellant's previous history of mental illness, she was ordered to undergo psychiatric examination at Central State Hospital. Pursuant to the results of the examination, the Superior Court, without a jury, sustained her special plea of insanity in June 1981. Appellant was then recommitted to Central State Hospital as provided by law. Appellant remained in the hospital until April 1983, when the court was advised by the staff of Central State Hospital, that appellant was now competent to stand trial. Appellant, thereafter, filed another special plea of insanity, and after a non-jury trial, appellant was found competent to stand trial.

At trial, appellant did not deny that she had killed Deputy West but defended solely on the ground that she was insane at the time of the act. The jury found the appellant guilty of murder, and she was sentenced by the court to life imprisonment. We reverse and remand with instructions.

In her enumeration of error, appellant contends the evidence was insufficient to sustain a jury finding that she was sane on the date of the alleged offense. The appropriate standard of appellate review of the sufficiency of the evidence with regard to a jury's finding of sanity in a criminal case is whether, after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence, that she was insane at the time of the crime. *Brown v. State,* 250 Ga. 66, 72 (295 SE2d 727) (1982).

In support of this contention, appellant first directs us to her long history of mental illness. Appellant has had what her family refers to as "spells" off and on for the past seventeen years. During these "spells" appellant often experienced auditory and visual hallucinations; feared that unknown and known persons were plotting against her and were going to harm her and her children; exhibited hostile and belligerent behavior towards her family; isolated herself and did a variety of other things not consistent with sanity. Prior to 1980, appellant was involuntarily committed for evaluation and treatment on four separate occasions. The first was in May 1976, following an attack by appellant upon her mother with a pair of scissors. Later in 1976, appellant was again committed after an incident in which she and her father "got into it about a gun." Appellant was involuntarily committed a third time in 1977 following the discovery of a pistol in her possession after she had threatened her family. The next time she was committed was in 1979 following an

incident in which appellant stabbed her nephew with a knife. Appellant was released on medication after a short treatment period following each of these incidents. The incident which led to the October 1980 commitment order involved appellant pulling a gun on her brother and the threatening of other family members.

In addition to her previous history, appellant also offered direct uncontradicted evidence of her mental condition shortly before and on October 28, 1980. Appellant's mother testified the day Deputy West was killed, appellant "had those spells on her." Two of appellant's brothers testified that two days prior to the killing, appellant's behavior was "crazy." The probate judge who issued all of appellant's previous commitment orders testified on October 28, 1980, appellant was "a mentally ill person requiring involuntary treatment." Mr. Homer Harrell, appellant's local mental health counselor testified that since he began seeing appellant on an out-patient basis in 1976, she has been difficult to manage. Specifically, she would often miss appointments and would not take her medication for long periods of time. Mr. Harrell wrote letters recommending that the staff at Southwestern State Hospital keep appellant for a "long stay."

Appellant also produced an expert witness at trial in the person of Dr. James B. Craig, a forensic psychiatrist and a consultant assigned to Central State Hospital. It was Dr. Craig's diagnosis that appellant was suffering from "Schizophrenia, Paranoid Type" and that this diagnosis was consistent with appellant's condition since her first treatment in 1976. It was Dr. Craig's expert opinion, as well as that of appellant's other treating physicians at Central State Hospital, that appellant could not distinguish between right and wrong at the time she killed Deputy West. The State did not present any affirmative evidence of appellant's sanity at trial.

Under Georgia law, every person is presumed to be of sound mind and discretion but this presumption may be rebutted. OCGA § 16-2-3 (Code Ann. § 26-606). Therefore, this trial began with the rebuttable presumption that appellant was sane, and this presumption is evidence. Kirk v. State, 252 Ga. 133 (311 SE2d 821) (1984); Fields v. State, 221 Ga. 307 (1) (144 SE2d 339) (1965). However, once the certified copy of the insanity order of October 28, 1980, was introduced into evidence, a counter presumption was raised. In Gilbert v. State, 235 Ga. 501, 502 (220 SE2d 262) (1975), we held that a defendant's administrative release from hospitalization under (OCGA § 37-3-85 (Code Ann. § 88-506.6)) cancelled a previously existing presumption of insanity. We now hold that an order of the Probate Court finding one a "mentally ill person requiring involuntary treatment," OCGA § 37-3-1 (12) (Code Ann. §

88-501), cancels a previously existing presumption of sanity and raises a presumption of insanity. Either presumption can, of course, be rebutted by evidence of the mental condition of the accused at the time of the offense, or that before and after the offense which tends to show his or her mental condition at the time of the offense. *Gilbert,* supra.

In support of its contention that there was sufficient evidence from which a jury could find that appellant was sane at the time of the offense, the State concedes it did not present any evidence in its case in chief of appellant's sanity at the time of the offense but relies on facts established through cross-examination of appellant's witnesses and the presumption of sanity. The State directs us to those cases holding that jurors are not bound by the opinions of either lay witnesses or expert witnesses as to the question of sanity and they may rely on the basic presumption existing under our law. Cf. *Brooks v. State,* 247 Ga. 744 (279 SE2d 649) (1981); *Moses v. State,* 245 Ga. 180, 181 (263 SE2d 916) (1980). As we previously discussed, there being no presumption of sanity in this case but one of insanity, the reliance on this line of cases is misplaced.

Applying the *Brown* standard to the facts in the case sub judice, in the light most favorable to the State, we hold that no rational trier of fact could have found that appellant failed to prove by a preponderance of the evidence that she was insane at the time she stabbed Deputy West. The very reason Deputy West was at appellant's home the day he was killed was to execute a previously issued court order to transport appellant to Southwestern State Hospital because she was "a mentally ill person requiring involuntary treatment." A review of the facts in *Brown,* supra, and *Phillips v. State,* 250 Ga. 336 (297 SE2d 217) (1982) reveals that in each case the State did not rely merely upon the presumption of sanity but introduced evidence that the accused was sane at the time of the offense. At appellant's trial, the State offered no evidence that appellant was sane on October 28, 1980, and the evidence presented by the defense was uncontradicted. Under these circumstances we are compelled to hold that appellant had proven by a preponderance of the evidence that she was insane at the time of the offense. "While it is a jury's function to determine the credibility of witnesses and the probative value of testimony, juries must weigh the evidence and may not arbitrarily ignore it. Insanity may be so clear and the proof so overwhelming that a jury finding of sanity cannot be upheld." *Brown,* supra at 71.

*Judgment reversed and remanded for compliance with OCGA § 17-7-131 (Code Ann. § 27-1503). All the Justices concur, except Marshall, P. J., Weltner and Bell, JJ., who dissent.*

DECIDED JANUARY 31, 1984 —
REHEARINGS DENIED FEBRUARY 16, 1984.

*Smith, Perry & Epps, Richard A. Epps,* for appellant.
*J. Brown Moseley, District Attorney, Michael J. Bowers, Attorney General, Paula K. Smith, Staff Assistant Attorney General,* for appellee.

WELTNER, Justice, dissenting.

The question before us, as in *Brown v. State,* 250 Ga. 66, 69 (c) (295 SE2d 727) (1982), is "on whom the burden of proof lay in this case. . . ." The majority holds that "an order of the Probate Court finding one a 'mentally ill person requiring involuntary treatment,' OCGA § 37-3-1 (12) (Code Ann. § 88-501), cancels a previously existing presumption of sanity and raises a presumption of insanity." (Opinion, p. 137) In *Brown,* we recognized that " 'special plea of insanity' is a misnomer because the issue is one of incompetence [to stand trial] rather than insanity. *Echols v. State,* 149 Ga. App. 620 (255 SE2d 92) (1979). A general plea of insanity, on the other hand, raises insanity as a defense and is an inquiry into whether the defendant could distinguish between right and wrong, or was suffering from a delusional compulsion, at the time of the crime. [OCGA §§ 16-3-2, 16-3-3 (Code Ann. §§ 26-702, 26-703)]." 250 Ga. at 70. We can clarify this whole field by discarding the ambiguous term "insanity," and speak instead in terms of *issues,* which will include competence to stand trial, ability to distinguish right and wrong, and delusional compulsion. See *Rooks v. Rooks,* 252 Ga. 11 (311 SE2d 169) (1984).

Seen in this light, the distinction between the involuntary civil commitment standard applicable to a person "mentally ill . . . requiring involuntary treatment" and a defense of inability to distinguish between right and wrong becomes apparent: the former has no *necessary* relationship to the latter. Hence, evidence of civil commitment cannot be, of itself, sufficient to shift the burden of proof to the state.

The jury having found as a fact that Butler was able to distinguish right from wrong, I would affirm the conviction.

Beyond the foregoing analysis, it is important, I believe, to consider the practical effect of the majority opinion on some 5,100 persons now committed to mental health institutions operated by the state. *Whatever* the cause for such a commitment, we have now removed from any conduct, of any one of these, the presumption of sanity; we have now burdened the state with the task of proving sanity as an affirmative requirement, beyond a reasonable doubt.

It is difficult to visualize how that burden might be carried in the future, bearing in mind the sanctuaries with which our law surrounds criminal defendants, withholding from the state practically every part of the truth-finding machinery which is readily available to every party in every civil matter.